# EXHIBIT B

 **In The Matter Of:**

*University of Connecticut v.*

---

*Erica Tsacoyeanes*

*January 29, 2015*

---

*BLF Reporting LLC*

*6 Andrews Street*

*Bristol, CT 06010*

Original File 01-29-15-BCT Tsacoyeanes_Erica.txt

**Min-U-Script® with Word Index**

RECEIVED
FEB 20 2015
OFFICE OF THE ATTORNEY GENERAL

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ERICA TSACOYEANES | : | 3:13cv1800 (WWE) |
| | : | |
| VS. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT, UNIVERSITY OF CONNECTICUT HEALTH CENTER, UNIVERSITY OF CONNECTICUT SCHOOL OF MEDICINE | : | |

* CONFIDENTIAL *

DEPOSITION OF: ERICA TSACOYEANES
DATE TAKEN: January 29, 2015
LOCATION: University of Connecticut Health Center
263 Farmington Avenue, AG093
Farmington, Connecticut

Reporter: Ann W. Friedman, LSR #91

BCT REPORTING LLC
P.O. BOX 1774
BRISTOL, CT 06011
860-302-1876

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
THOMAS W. BUCCI, ESQ.
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, Connecticut 06604
Phone: 203-366-3939
E-mail: tbucci@wwblaw.com

ON BEHALF OF THE DEFENDANTS:
LYNN D. WITTENBRINK, AAG
LAURA THURSTON, INTERN
UNIVERSITY OF CONNECTICUT HEALTH CENTER
263 Farmington Avenue, MC3803
Farmington, Connecticut 06030-3803
Phone: 860-679-1654
E-mail: wittenbrink@uchc.edu

# I N D E X


| WITNESS | PAGE |
|---|---|
| ERICA TSACOYEANES | |
| Direct Examination By Ms. Wittenbrink | 5 |
| Cross-Examination By Mr. Bucci | 215 |


## DEFENDANTS' EXHIBITS

(Exhibits held by Ms. Wittenbrink.)


| Exhibit | Description | Page |
|---|---|---|
| Exhibit 1 | not introduced | 5 |
| Exhibit 2 | SCO - ob/gyn rotation | 5 |
| Exhibit 3 | Amended Complaint | 5 |
| Exhibit 4 | not introduced | 5 |
| Exhibit 5 | not introduced | 5 |
| Exhibit 6 | not introduced | 5 |
| Exhibit 7 | not introduced | 5 |
| Exhibit 8 | Notice of Deposition | 10 |

Q. And was that Jon Schoenhorn?
A. Yes.
Q. How did you get his name?
A. I got his name through a student who had been through some legal issues with our school.
Q. Who was that?
A. ., but I can't spell the last name.
Q. Do you know what it starts with?
A. .
Q. What was your understanding of what legal issues were?
A. He didn't want to --

MS. WITTENBRINK: Actually, can we go off the record for one second?

(Off-the-record discussion.)

MS. WITTENBRINK: Back on the record. Attorney Bucci and I have agreed that those portions of the deposition where other students, and I guess we could say residents, are mentioned will be, by agreement, subject to a confidentiality agreement between counsel and not used for any other purpose, other than reading for this litigation at this point in time, until further notice. Fair to say?

middle of conducting an interview, so I couldn't.

Q. For what?

A. I interviewed for my undergraduate, so I was in the middle, I saw him, gave him a hug, said, "Hi, how are things," and that was it.

Q. Do you intend to have further communication with him?

A. No, we didn't make plans to meet up or anything, but . . . So no.

Q. Okay. If you could look at page 7 of the Amended Complaint, dated May 22nd, 2014.

A. Page?

Q. Seven.

A. Yep.

Q. So, paragraph 31 refers to the Caucasian student, and that's the student whose name you don't know?

A. Correct.

Q. And that's the one that Dr. Lewis told you about?

A. Yes.

Q. Did you ever see him by sight? Did you ever have any idea who she was talking about, if he was in your same graduating class?

A. I had an idea of who he was, but not --


but not officially. Like, nobody had given me his name.

Q. Where did you get the idea?

A. I mean, the math of it, the timing of it, you know, it was a student on her rotation at that point, and I knew who was on that next rotation and I knew who was working under her part of the rotation, so . . .

Q. So who do you think it is?

A. A Caucasian male. I'm not remembering his name. I know his stature and I know what he looks like, but I do not -- I don't know his name.

Q. And in paragraph 33, it says, "During one of his required rotations at approximately the same time that the plaintiff had submitted the unsigned SCO, the Caucasian student submitted three SCOs containing the purported signatures from the supervising physician." Is all of the information in that paragraph stuff that you're saying that you heard from Dr. Lewis?

A. Yes.

Q. Okay. And the same with 34, that he had forged the physicians' signatures?

A. Yes.

Q. And 35 says, "The lead doctor, acting with

due diligence, approached the physician who had supposedly signed this Caucasian student's SCOs and inquired about the genuineness of the signatures." So, who's the lead doctor?

A. Dr. Lewis.

Q. So she was the lead doctor in charge of the psychiatric rotation?

A. Yes.

Q. Who was the physician who had supposedly signed the Caucasian student's SCOs?

A. She did not tell me.

Q. Okay. And then when you say, in paragraph 37 on page 8, "The lead doctor informed the decision-making authorities of the medical school who are responsible for student discipline, the same individuals who had expelled the plaintiff," what does that paragraph refer to?

A. Dr. Lewis informing Dr. Henderson.

Q. Okay. Did she inform anyone other than Dr. Henderson?

A. I do not know.

Q. And who told you that the Caucasian student was permitted to complete his course of studies and graduate?

A. Dr. Lewis had stated that she was not

questioned about this student, and as the head of the rotation, she should have been, much like Dr. Walsh was questioned about my rotation, by Dr. Henderson and the Academic Advancement Committee, and she was not aware that the student had any repercussions from this and moved forward just fine.

Q. Okay. Other than Dr. Lewis, do you have any other information about this student?

A. No.

Q. So you were told on the 25th of February to pack your bags and go, right?

A. Yes.

Q. And that was told to you by Dr. Raj?

A. Dr. Rajan.

Q. Rajan. Thank you. And then at some point, you said that Dr. Henderson also told you that you could not work and that you should be focused entirely on your ethics curriculum; is that correct?

A. Yes.

Q. And when did you have that conversation with Dr. Henderson?

A. Approximately the beginning of March, but it wasn't too far after I was given the initial suspension.

Q. Okay. And how did that conversation with

STATE OF CONNECTICUT )
) SS.
COUNTY OF HARTFORD )

I, Ann W. Friedman, License No. 91, a notary public for the State of Connecticut, do hereby certify that the deposition of ERICA TSACOYEANES, was taken before me at the University of Connecticut Health Center, 263 Farmington Avenue, Farmington, Connecticut, commencing at 10:35 a.m. on Thursday, January 29, 2015.

I further certify that the witness was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and her testimony was stenographically reported by me and subsequently transcribed as hereinbefore appears; that this deposition is a true record of the testimony given by the witness to the best of my ability.

I further certify that I am not related to the parties hereto or their counsel, and that I am not in any way interested in the event of said cause.

Dated this 18 day of Feburary, 2015.

Ann W. Friedman
Ann W. Friedman, Notary Public
My commission expires: 8-31-16.